| | |
|---|---|
| TRUDY BROWN, DELVIN SERRANO, JENNIFER SERRANO, ANNA KIMBRELL, CANDACE DOSS, and other similarly situated, | * * * * * NO. _____ * |
| Plaintiffs, | * |
| v. | * JURY DEMAND * * * |
| RIVER CITY CLEANING & RESTORATION, INC. d/b/a SERVICE MASTER CLEANING & RESTORATION, WILLIAMS B. BARBEE, JR., and ROBERT WHITE, | * COLLECTIVE ACTION * * * * * * * * |
| Defendants. | * |

# COMPLAINT

Come the Plaintiffs, by and through their attorneys, and for their claims against the Defendants would show unto the Court as follows:

1. Plaintiff Trudy Brown ("Plaintiff or Plaintiff Brown") is a resident of Ooltewah, Hamilton County, Tennessee.

2. Plaintiff Delvin Serrano ("Plaintiff" or "Plaintiff Serrano") is a resident of Chatsworth, Georgia.

3. Plaintiff Jennifer Serrano ("Plaintiff or "Plaintiff J. Serrano") is a resident of Chatsworth, Georgia.

4. Plaintiff Anna Kimbrell ("Plaintiff" or "Plaintiff Kimbrell") is a resident of Chatsworth, Georgia.

5. Plaintiff Candace Doss ("Plaintiff" or "Plaintiff Doss") is a resident of East Ridge, Hamilton County, Tennessee.

6. Upon information and belief, Defendant River City Cleaning & Restoration, Inc. d/b/a ServiceMaster Cleaning & Restoration "(Defendant ServiceMaster") is a Georgia Corporation with its principal office at 4295 Cromwell Road, Chattanooga, Tennessee 37421.

7. Upon information and belief, Defendant William B. Barbee, Jr. is an owner of Defendant ServiceMaster and lives at 19 Timber Lake Cove NE, Cartersville, GA 30121.

8. Upon information and belief, Defendant Robert White is the managing partner of Defendant ServiceMaster and lives at 607 Ohio Avenue, Signal Mountain, TN 37377.

9. The business activities of the Defendants, including, but not limited to, the number of employees, are sufficient to render them subject to the provisions of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §201, et seq. ("FLSA") and all corresponding regulations, as well as the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, et seq., ("Title VII") and the Equal Pay Act, 29 U.S.C. § 206, et. seq. ("EPA").

10. The individual Defendants in this matter, are also considered "employers" under the definitional terms of the FLSA and the EPA and are therefore individually liable.

11. The Defendants are in the business of offering cleaning and restoration services in Hamilton County, Tennessee and surrounding areas. Their activities are sufficient to subject them to the minimum wage, maximum hours, and anti-retaliation provisions of the FLSA, as well as all provisions of the EPA.

12. This Court has jurisdiction over this case by virtue of the provisions contained in 28 U.S.C. §1331, 28 U.S.C. §1332, and 28 U.S.C. §1367.

13. Plaintiff Brown was employed by Defendants from July 18, 2011 until her termination on March 21, 2014. Her last position was "project manager" and she was paid on an hourly basis in that position.

14. Plaintiff Serrano was employed by Defendants from July 11, 2012 to May 27, 2014. She had been working as a "project manager" or supervisor at the time she became separated and was paid on an hourly basis.

15. Plaintiff Jennifer Serrano was employed by Defendants from July 9, 2012 to May 27, 2014 as a "Fire Technician."

16. Plaintiff Anna Kimbrell, whose maiden name was Anna Serrano, was employed by Defendants from July, 2012 to May 27, 2014 as a "Fire Technician."

17. Plaintiff Doss was employed by Defendants from August 1, 2013 until May 27, 2014.

18. The Defendants customarily required the Plaintiffs to work more than 40 hours in each work week without providing overtime compensation as required by law.

19. The Defendants also customarily violated the record-keeping provisions of the FLSA.

20. For example, Plaintiffs were told they had to write down on their timesheets that they took a one hour lunch break regardless of whether they actually worked during that time or were able to use it for their own purposes. Defendants had knowledge that at times they worked during those periods and were nonetheless not compensated for their work during those periods.

21. In addition to the unpaid lunches, Plaintiffs were required to engage in compensable work prior to opening and subsequent to the actual work done on the jobsites and were not compensated for all of their time.

22. Further, Plaintiffs Brown and Serrano were suffered or permitted to work at home and were not compensated for such time worked. While working from home, they completed various reports and daily notes, engaged in coding activities, and updated computer programs for insurance billing cases. Plaintiff Brown was told by Defendant White (and his wife, who was in charge of human resources) not to include such time on her time sheets.

23. Plaintiff Brown also performed work on Saturdays off the clock.

24. In addition to receiving no compensation for the time spent prior to arriving at jobsites, during lunch, and subsequent to work at jobsites, as well as the home work performed by Plaintiffs Brown and Serrano, Plaintiffs also did not receive required overtime compensation for such time.

25. Shortly after Plaintiff Brown became employed, she began to face hostile treatment, due to her gender, from two project managers, Easten Farlett and Skylar Duckworth.

26. For example, Mr. Farlett told Ms. Brown, in front of a customer, that she was a woman trying to work in a man's world and if she was going to try and "wear the pants" then she would have to take care of herself. This was during a period in which Plaintiff was working on the "water" side of the business with Mr. Farlett and Mr. Duckworth.

27. Upon information and belief, this statement was reported to Defendants, who took no action in response.

28. Relating to the same, Mr. Farlett and Duckworth and other male employees refused to work as team members with female employees and would not assist them with lifting when team lifting was required.

29. Plaintiff Brown began complaining about the manner in which she was being treated in the Winter of 2012. Plaintiff met with Mr. Barbee at that time and voiced her complaints. As a result, she was officially removed from the "water" side of the business (although she was later asked to perform work for that "side"), and her pay was effectively reduced by $1.00 per hour.

30. Plaintiff Brown was later asked to perform work on the "water" side and was paid less than similarly situated male employees for the same work.

31. Even after she was removed from the "water" side of the business, she was still subjected to gender-based and retaliatory comments from the male employees.

32. For example, the other Plaintiffs were told that Plaintiff Brown was "whiney," difficult to work with, and a "bit**."

33. As a result, Plaintiff Brown met several times with Defendant Barbee and/or Defendant White to no avail. In fact, Defendant White dismissed her complaint and summarily said he did not believe it was true.

34. Upon information and belief, during their employment, Plaintiff were paid less in compensation and bonuses than similarly-situated male employees and were denied opportunities for higher paying work that were given to male employees.

35. Plaintiff Brown was terminated on March 21, 2014, after complaining about discrimination in terms of who received bonuses relating to work she had performed in January of 2014 on the "water" side of the business.

36. Prior to her termination, Tyler Barton, a male employee, was hired to replace Plaintiff Brown.

37. Mr. Barton was hired and put into Plaintiff Brown's position even though Plaintiff Serrano had been training for, obtaining her certifications for, and planning to eventually gain that title and position with Defendants. Upon information and belief, Plaintiff Serrano was not even considered for the position and Mr. Barton was less qualified. Further, Mr. Barton was paid at a higher rate than Plaintiffs for similar work and was given raises in pay prior to gaining certifications that were required of the female employees for them to receive a pay increase.

38. Plaintiff Brown was terminated for pretextual reasons.

39. Following her termination, the other Plaintiffs were asked to meet with Defendants and were told that Defendants had to build a file against Plaintiff Brown in case she sought legal protection. Accordingly, Defendants gave the other Plaintiffs write ups for supposedly falsifying time sheets and asking to be paid for time they were taking a lunch break, even though Plaintiffs had not engaged in such activity (and in fact, one of the Plaintiffs was not even at work on the day in question).

40. However, male employees frequently engaged in personal business while on the clock and were never disciplined for the same. For example, Mr. Farley and Mr. Duckworth slept while on the clock, with the knowledge of the Defendants, and were never disciplined for the same.

41. When Mr. Barton was promoted into the Senior Project Manager role, he immediately began sexually harassing Plaintiff Serrano and treating the other female members of the fire crew in a demeaning and offensive manner due to their gender.

42. For example, Plaintiffs were referred to as "the girls."

43. For example, Mr. Barton referred to Plaintiff Serrano as his "work crush" and talked about her buttocks with other employees. He tried to snap her on the behind with towels and rags used to perform work. He attempted to spray cleaning chemicals on her private parts at work. Mr. Barton attempted to massage her and also put his hand down his pants, suggesting that he was touching his private parts in her presence. Mr. Barton told other employees, talking about Plaintiff Serrano, "look at how perfectly round her butt is, who wouldn't want to…"

44. Mr. Barton's sexual discussions in the workplace were not limited to references about Plaintiff Serrano. Mr. Barton told Plaintiff Doss that he would "suck Robert's d*ck" or "take it up the bu*t" for a million dollars. He once told Ms. Doss that his male parts were stuck to his leg.

45. Plaintiff Serrano told Mr. Barton to discontinue that behavior.

46. Mr. Barton used foul language in speaking to the Plaintiffs on job sites.

47. On numerous occasions, Plaintiffs reported Mr. Barton's treatment of them to Defendant White. Plaintiff Doss told Defendant White's wife about how Mr. Barton was trying to slap towels on Ms. Serrano's behind, to which Ms. White said, "I don't believe that."

48. For example, in mid-May of 2014, Mr. Barton cussed at Plaintiff Doss on a jobsite in front of a homeowner. This was reported to same day to Defendant White's wife.

49. Matters escalated several days later, on May 22, 2014 while they were all performing an intense fire job at a residence. After working for over three hours straight in a difficult environment, Plaintiff Doss requested a brief break so she could get a drink. In response, Mr. Barton told her to "get your shit and go and don't fu**ing come back tomorrow." Plaintiff Serrano stood up for Plaintiff Doss and asked if Plaintiff Doss could just take a short break and Mr. Barton said that if they had anything to say they could "grab with sh*t" and catch

a ride back with Candace (and Mr. Farley, who was also on the job that day) because he was "sick and fu**ing tired" of them not "knowing who the boss is."

50. That evening, Defendant White told Plaintiff Serrano that the fire team "girls" needed to stay out of work the next day (Friday) without pay to "calm down" and take a break from the events the day before. Defendant White told Plaintiff Serrano that if the fire team girls couldn't get along with Mr. Barton then they would no longer have a job. Although Plaintiff Kimbrell was not even working on May 22, 2014, she was suspended without pay along with "the girls." To defendant that, Defendant White told Plaintiff Serrano that the entire fire team was being punished that day, although Mr. Barton was part of the team and allowed to work.

51. Following that, Plaintiffs wrote letters to Defendants to formally voice their complaints about the discrimination to which they were subjected. In the letters, the Plaintiffs (other than Plaintiff Brown) objected to sexual harassment and discrimination.

52. Following their one-day suspension without pay, Plaintiffs (other than Plaintiff Brown) met with Defendant White and Mr. Barton on the next following work day, Tuesday, May 27, 2014. During the meeting, Plaintiffs (other than Plaintiff Brown) discussed the demeaning treatment from Mr. Barton. After raising that, Defendant White called Mr. Farley and Mr. Duckworth into the meeting. Plaintiffs raised Mr. Barton's inappropriate comments and touching and were teased about it. They were told by the males in the room to "sue em" and Defendant White jokingly asked one Plaintiff if she was going to accuse him of sexual harassment because he patted her on the shoulder when she walked in the room. At the conclusion of the meeting, Plaintiff were admonished that they had to deal with Mr. Barton the way he was because he was "not going anywhere" and that they could either do that or be out of a job. They refused to continue to deal with Mr. Barton and were terminated as a result.

53. With the terminations of the Plaintiffs, that left no non-office employees at that time who were female.

54. Upon information and belief, after Plaintiffs were terminated, Defendants gathered evidence to try and dispute their claim for unemployment benefits. In so doing, Defendants asked employees to write out letters saying they had not witnessed any sexual harassment. Upon information and belief, one or more employees honestly reported that they had witnessed offensive conduct. After receiving those statements, Defendant White exclaimed, "can you believe this sh*t?" and tore up the honest statements. Those statements were never submitted to the unemployment tribunal.

55. Shortly after Plaintiff Brown was terminated, Defendant White contacted several other businesses nearby and told managers or owners at those businesses not to hire Plaintiff Brown. During the calls, he told the other businesses that Plaintiff Brown was a thief and a liar. Defendant White then bragged at the office about having made the calls.

56. Upon information and belief, the Plaintiff were denied equal pay, raises, bonuses, and benefits for equal work performed by male employees.

57. The violations in this case were willful.

58. Plaintiffs incorporate all of these facts, inferences, and facts discovered in the course of litigation, in the counts below.

**FLSA VIOLATIONS**

59. The Defendants violated the minimum wage and maximum hours provisions of the FLSA, 29 U.S.C. § 206 and 207 (and all corresponding regulations), by failing to pay the Plaintiffs time and one-half their regular rate of pay for all hours worked in excess of 40 hours in each work week.

60. The Defendants violated the record-keeping requirements of the FLSA, 29 U.S.C. § 211 and corresponding regulations.

## EPA VIOLATIONS

61. Defendants unlawfully compensated the Plaintiffs in violation of the Equal Pay Act, 29 U.S.C. § 206(d). Plaintiffs were unlawfully denied equal pay to which they are entitled.

## TENNESSEE HUMAN RIGHTS ACT VIOLATIONS

62. Plaintiffs were discriminated against on the basis of their gender in violation of Tenn. Code Ann. § 4-21-301, *et seq*.

63. Plaintiff additionally faced a hostile work environment on the basis of their gender in violation of Tenn. Code Ann. § 4-21-301, *et seq*.

64. Plaintiffs were retaliated against in violation of Tenn. Code Ann. § 4-21-301, *et seq*. due to their protected activities and opposition to the unlawful work conditions.

## DEFAMATION

65. Defendant White, on behalf of all Defendants, made false and defamatory statements about Plaintiff Brown following her termination, causing her to lose job opportunities and damaging her reputation in the business.

66. The statements were published with knowledge of their falsity or with reckless disregard for the truth.

67. As a result of all of the Defendants' wrongful conduct, the Plaintiffs have suffered lost pay, benefits, and the humiliation and embarrassment flowing from the discriminatory or retaliatory treatment described herein.

68. Plaintiffs accordingly pray for the following relief:

a. That the Court issue an injunction requiring Defendants to reemploy Plaintiffs at their former positions or equivalent jobs with all employment rights and benefits to which they would have been entitled but for their discharge and without harassment or illegal conditions imposed on their job, or, in the alternative, front pay and benefits in lieu of reinstatement;

b. An appropriate Order awarding Plaintiffs, and those similarly situated, all wages and compensation due to them, together with an equal amount as liquidated damages,

c. An appropriate Order awarding back pay and an equal amount of liquidated damages, damages for humiliation and embarrassment, damages for emotional distress, and punitive damages;

d. Attorneys fees and litigation expenses under all applicable statutes;

e. Prejudgment interest;

f. A jury to try the non-FLSA issues; and

g. All such further relief to which Plaintiff may be found entitled.

Respectfully submitted,

BURNETTE, DOBSON & PINCHAK

By:__s/ *Donna J. Mikel*_____
     Donna J. Mikel, BPR #020777
     Attorneys for Plaintiffs
     711 Cherry Street
     Chattanooga, TN 37402
     Phone: (423) 266-2121
     Fax: (423) 266-3324
     Email: dmikel@bdplawfirm.com